IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| YASAS RODRIGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-cv-2274 |
| | ) | |
| CARLE FOUNDATION HOSPITAL, d/b/a | ) | |
| CARLE FOUNDATION HOSPITAL & | ) | |
| FAMILY MEDICINE RESIDENCY, an | ) | |
| Illinois Corporation | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff worked diligently as a medical Resident at Carle Hospital with his sights set on a medical license in the field of Family Medicine. Contrary to Plaintiff's success with patients, above-average evaluations of his professors, and an eventual promotion to Co-Chief resident would suggest, Plaintiff suffered from obstructive sleep apnea, periodic leg movement disorder, and chronic insomnia.

Plaintiff had to overcome a number of obstacles while working in Carle's residency program including a surplus of patients, working an excess of the maximum hours permitted by the Accreditation Council for Graduate Medical Education ("ACGME"), and an inability to successfully pass the final exam required for promotion to his last year of residency. However, this inability was prolonged and reinforced by Defendant's failure to provide reasonable accommodations for Plaintiff's sleeping disability; even after Plaintiff complained on numerous occasions to a number of his superiors. They all dismissed his disability as "common" among residents, and underserving of further intervention.

Defendant maintained a policy that residents could not be promoted to their last year of residency if they failed to pass Step 3 on their third attempt. However, because Defendant had

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

granted exceptions for certain residents in the past, Plaintiff hoped that his request for an extension of time to pass Step 3 after his third failed attempt would similarly be granted. Instead, Defendant relied blindly and heavily on their policy, and forced Plaintiff into resignation from the Program without any opportunity for reinstatement.

As a medical institution, Defendant failed to intervene and accommodate Plaintiff's request as mandated by the ACGME. Furthermore, Defendant subjected Plaintiff to harassment and disparate treatment based on his disability, and eventually retaliated against him based on his request for reasonable accommodations. Finally, Defendant failed to reasonably accommodate Plaintiff's disability. As the record shows, a genuine dispute exists as to a number of material facts. Therefore, the Court should deny Defendant's motion for summary judgment on the following claims[1].

## BACKGROUND

Plaintiff began working for Defendant in July 2010 as a part of its Family Medicine Residency Program ("Program"). (Def. Ex. 1, 23:21-22). Throughout his tenure, Plaintiff received a myriad of positive feedback. (Def. Ex. 2, pp. 92:2-4, 93:16-21, 99:9-12, 115:9-11, 126:16-127:5, 129:14-20, 168:8-11, 169:2-4). His professionalism and likeability eventually promoted him to Co-chief Resident—a position earned through a unanimous election of his resident peers. (Def. Ex. 1, 61:7-10); (Def. Ex. 4, pp. 47:20-23, 48:17-49:2). Meanwhile, Plaintiff was suffering from obstructive sleep apnea, periodic leg movement disorder, and chronic insomnia. (Def. Ex. 2, 6:20-7:2).

Residents were required to pass a series of tests under the United States Medical Licensure Exam (USMLE"), involving three exams: Step 1, 2, and 3. (Def. Ex. 4, 53:7-13);

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

---

[1] Plaintiff has decided to voluntarily dismiss the following claims against Defendant: (1) Harassment based on gender and national origin in violation of Title VII; (2) Disparate treatment based on his gender and national origin in violation of Title VII; and (3) Hostile work environment.

(Def. Ex. 5, 20:20-7). Defendant chose to enact a policy allowing a maximum of three attempts to pass Step 3. If a resident failed Step 3 a third time, there is potential grounds for dismissal. (Def. Ex. 1, 35:1-9); (Def. Ex. 24, pg. 2, ¶ 1) ("I did tell him at the meeting that further failure on Step 3 could result in termination from the program").

During Plaintiff's first year, it was recommended that he complete Step 3 as soon as possible. However, Plaintiff's Advisor, Dr. Jane Kim ("Dr. Kim") and Program Director, Dr. Bharat Gopal ("Dr. Gopal") told Plaintiff to not worry about it yet. (Ex. A, ¶ 6); (Def. Ex. 2, 53:2-21). In late 2010, Plaintiff explained his sleeping problems to Dr. Gopal and requested a reduced workload. (Def. Ex. 2, pp. 132:16-133:15). Plaintiff's request was rejected despite Defendant's prior grant to other residents, Dr. Lindsay George and Dr. Nelly Ruiz. (Def. Ex. 1, 134:5-12). Additionally, Dr. Nelson dismissed Plaintiff's disability as a "common" complaint among other on-call residents. (Def. Ex. 1, 30:10-14). However, Plaintiff's disability expanded well beyond his on-call duties, and differed in its level of severity.

Plaintiff saw a sleep specialist in November 2011, Dr. Charles Davies, and participated in a sleep study. (Def. Ex. 3); (Def. Ex. 2, pp. 248:16-249:3). Plaintiff later provided medical documentation verifying his disability to Defendant in November 2012, unprovoked by any requests. (Def. Ex. 2, 264:17-24). Although medical documentation was not necessarily required, Plaintiff nonetheless fulfilled Defendant's Reasonable Accommodation Policy that, "Verification of the disability by the requester's physician, medical provider, or vocational/rehabilitation counselor *may* be required." (emphasis added). (Def. Ex. 32, pg. 9, ¶ (A)(3)).

Throughout his residency, Plaintiff notified Defendant that his sleeping disability was affecting his success in the Program, including: (1) At a meeting with Dr. Kim in November 2010 (Def. Ex. 2, 258:3-15); (2) At a meeting with Dr. Timothy Meneely between November

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

2010 and May 2011 where he convinced Plaintiff to refrain from complaining externally (Def. Ex. 2, pp. 270:19-271:19); (3) At a Progress & Promotions Committee ("P&PC") Meeting on January 7, 2011 (Def. Ex. 1, pp. 74:8-11, 76:7-77:6); (4) At a meeting with Dr. Gopal and Ms. Alper on January 4, 2011 where Plaintiff requested a lighter workload; (5) On at least five occasions with Ms. Alper (Def. Ex.3); (6) In a post-remediation meeting with Dr. Gopal, Dr. Kim, Dr. Lynda Alper, and Dr. Nelson in April 2011 (Def. Ex. 2, pp. 181:7-184:6); (7) At a meeting with Dr. Nelson in the summer of 2012 (Def. Ex. 1, 30:15-18); and (8) At a meeting with Dr. Gopal on August 30, 2012 (Def. Ex. 4, 56:9-21).

Between January and June 2011, Plaintiff successfully completed two remediation plans and repeated his Obstetrics and Family Medicine In-Service rotations at Defendant's request. (Def. Ex. 4, pp. 32:24-33:14, 34:12-20, 34:25-35:2, 35:15-21); (Def. Ex. 1, pp. 53:9-18, 54:13-15). During his first remediation, Dr. Kim persuaded Plaintiff to forego the appeal process, because "it will not change anything." (Def. Ex. 2, 145:16-20). On June 1, 2011, Plaintiff wrote a letter to Dr. Gopal and the P&PC to appeal the decision that he remediate his rotations for the second time. As an alternative, Plaintiff suggested that he complete an elective in FMIS to alleviate any concerns regarding his competency. (Ex. C). His appeal was denied. (Ex. C). Dr. Gopal granted requests made by other residents to repeat one of their rotations during an elective slot, in situations similar to Plaintiff's case. (Def. Ex. 1, pp. 51:16-53:4).

As Plaintiff's sleep disorder continued, Plaintiff was working excessive hours and assigned increased patient loads in violation of ACGME policy[2]. There had been complaints in previous years about hours being assigned in excess of the maximum. (Def. Ex. 1, 7:16-19).

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

---

[2] ACGME policy stated: residents could not work more than 80 hours per week; no more than 30 hours could be worked consecutively at any one time; there must be at least 48 hours off between calls; there must be, on average, one day off per every seven days over the course of a four week experience; and residents must have at least 10 hours off between each shift. (Def. Ex. 4, pp. 21:21-22:6); (Def. Ex. 1, pp. 57:23-58:15).

4

Plaintiff complained about his workload to Dr. Kim, who acknowledged Plaintiff's concern in a Quarterly Advisor Meeting. (Def. Ex. 4, 99:1-8). In 2011, Dr. Gopal consulted with Dr. Kim, Dr. Nelson, and Ms. Alper about whether some underlying issues may be affecting Plaintiff's progress, such as a learning disability. (Def. Ex. 4, pp. 44:2-21, 47:8-9); (Def. Ex. 5, 91:18-23); (Ex. B, pp. 40:23-41:22). As a result, Dr. Gopal and Plaintiff agreed to complete a neuropsychological evaluation. (Def. Ex. 4, 41:10-42:2). However, Dr. Gopal insisted that it be conducted by Defendant's employee, Dr. Joseph Alper, the husband of Ms. Alper. (Def. Ex. 4, 42:3-11). Because Ms. Alper was Program faculty and a P&PC member, Plaintiff was concerned about the confidentiality of his test results. (Def. Ex. 4, pp. 96:2-97:5).

Dr. Gopal agreed to set up the evaluation with an outside specialist at Northwestern Hospital. (Def. Ex. 4, 43:5-13). Yet, Dr. Gopal never followed through in scheduling, supervising, or finalizing this evaluation. (Def. Ex. 4, pp. 43:19-44:1). The Quarterly Advisor meeting notes indicate that Dr. Gopal "will be scheduling [the] neuropsych evaluation ASAP." (Def. Ex. 4, 95:18-22); (Def. Ex. 20, pg. 15). Dr. Kim, who also failed to follow-up with the evaluation, noted that she "will discuss with PD (Dr. Gopal) possibility and ramifications of outside neuropsych eval." (Def. Ex. 20, pg. 16); (Def. Ex. 4, 97:8-15).

During his residency, Plaintiff's sleeping disability prevented him from successfully passing Step 3 without reasonable accommodations. (Ex. A, ¶ 5). Plaintiff failed Step 3 the first time on May 9, 2012 while fighting severe insomnia, and even falling asleep during portions of the exam. (Def. Ex. 25). Plaintiff was further humiliated when Defendant's Human Resources employee, Tammy Plutz, revealed to other residents that Plaintiff had failed his Step 3 exam. (Def. Ex. 2, pp. 236:5-238:2). Plaintiff subsequently failed Step 3 the second time on July 23, 2012 after falling asleep for four sections of the exam. (Def. Ex. 25).

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

Plaintiff met with Dr. Nelson during the summer of 2012 to describe how his sleeping issues influenced his results on his first two attempts. (Def. Ex. 1, pp. 31:22-32:15). Plaintiff also met with Dr. Gopal in August 2012, and informed him of his belief that he failed due to a lack of sleep that prevented him from being able to effectively study or complete the test. (Def. Ex. 4, 56:9-21). Dr. Gopal suggested that Plaintiff take a leave of absence. (Def. Ex. 4, pp. 58:17-25; 59:14-18). However, Plaintiff was worried that his absence would lead to a violation of USMLE policy requiring residents to fulfill all testing obligations within a seven year block. (Def. Ex. 4, 59:1-6); (Def. Ex. 2, pp. 214:18-216:2). After fatigue prevented Plaintiff from passing Step 3 on a third time on September 23, 2012, Plaintiff appealed to Dr. Gopal and Dr. Kim for an extension of time in the Program (Def. Ex. 25). Specifically, Plaintiff requested the opportunity complete his residency as planned with a one month extension. This would allow him to sit for his last USMLE attempt on May 9, 2013, with results in early June. Dr. Gopal, who had the final authority on this requested accommodation, denied the request. (Def. Ex. 1, pp. 105:25-106:7).

On October 30, 2012, Defendant terminated Plaintiff's employment but gave him the option of labeling it as a "resignation." (Def. Ex. 1, 66:11-23); (Def. Ex. 4, 71:5-72:1). Dr. Gopal admitted that if Plaintiff did not choose to resign, this would have resulted in his termination. (Def. Ex. 4, pp. 73:25-74:3). During the termination meeting, Dr. Gopal claimed that he "had no choice but to terminate [Plaintiff] from the program," due to Defendant's policy to only allow a resident to fail three times. (Ex. A, ¶ 18). Dr. Gopal also admitted that he "should have" followed through with the evaluation he asked Plaintiff to undergo in 2011. (Ex. A, ¶ 18).

Though Defendant has claimed it had a bright-line policy on failing three times, Dr. Gopal discussed other options with Dr. James Dougherty prior to Plaintiff's termination

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

6

meeting. (Def. Ex. 4, pp. 66:4-14, 68:18-23). One option included allowing Plaintiff to take the test an indefinite amount of times. (Def. Ex. 4, pp. 66:4-14, 68:18-23). Additionally, a previous Carle resident, Dr. Nalu Reddy, was permitted to continue with the program after failing the Step 3 exam three times. (Def. Ex. 1, 35:10-19); (Def. Ex. 4, 79:12-15). Throughout his residency, Plaintiff was unware and uninformed that he was required to formally fill out a written Request for Reasonable Accommodation. (Ex. A, ¶ 11). Rather, he was only advised to contact his supervisor. (Ex. A, ¶ 11). Even Dr. Gopal admitted that there was no specific policy concerning requests for accommodating medical conditions. (Def. Ex. 4, 122:25-123:3).

When Plaintiff's request to be reinstated was denied, along with his other requested accommodations, Plaintiff lodged a formal complaint with ACGME. (Def. Ex. 4, pp. 15:25-16:3). Among those concerns was the number of duty hours that residents were working. (Def. Ex. 4, 16:19-23). In June 2014, Defendant lost its ACGME accreditation based on information the ACGME compiled from a site visit in April 2013. (Def. Ex. 4, pp. 14:11-14, 14:20-15:9). Plaintiff continues to receive treatment for his sleeping disability. (Def. Ex. 2, pp. 6:20-7:2).

**ARGUMENT**

    **I.**    **Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits… show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court should not grant summary judgment where there are contestable issues of material fact. *Id.* In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable inferences in the light most favorable to the plaintiff. *Redd v. Nolan*, 718 F.Supp.2d 927, 929 (7th Cir. 2010); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002). Summary judgment is "notoriously

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

inappropriate" for deciding an action where issues of intent, good faith, or subjective feelings play an important role in determining the issues. *Kephart v. Inst. Of Gas Tech.*, 630 F. 2d 1217, 1218 (7th Cir. 1980). This is because the issue of intent is usually not capable of being resolved by summary judgment. *See Beard v. Whitley Cty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988). As a result, the standard is applied with added rigor in employment discrimination cases where intent and credibility are crucial issues. *See Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir. 1995).

To survive summary judgment, a plaintiff need not prove that the real reason for an employer's action was discriminatory. *Bell v. EPA*, 232 F.3d 546, 550 (7th Cir. 2000). A plaintiff need only produce evidence that creates an issue of fact as to whether the employer's legitimate, nondiscriminatory reasons were pretextual. *Perdomo*, 67 F.3d at 145. Because a fact finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes summary judgment. *Bell*, 232 F.3d at 550.

The Americans with Disabilities Act ("ADA") provides that a covered employer shall not discriminate against a qualified individual with a disability because of the disability. 42 U.S.C. § 12112(a). "Discrimination," under the ADA, includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." § 12112(b)(5)(A). Thus, the ADA requires employers to reasonable accommodate the limitations of its disabled employees.

**II.      Plaintiff is a Qualified Individual with a Disability under the ADA**

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

of employment." 42 U.S.C. § 12111(8). Here, Plaintiff soundly established his ability to perform as a Carle resident, as evidenced by his promotion to co-chief resident his positive review and feedback, and his ultimate success in passing USMLE- Step 3. While USMLE-3 may have been necessary for promotion to PGY-3 status and an eventual medical license, Plaintiff was already meeting the legitimate expectations of the job in which he was already qualified an already working—a PGY-2 resident.

Plaintiff did not forfeit his "qualified" status merely by initially failing to meet a licensure requirement that he eventually overcame. Defendant even admits that a temporary setback does not negate an individual's qualified status. (Def. Mot., pg. 18) (Plaintiff satisfied the definition of a "qualified individual" during remediation). Plaintiff's unique set of facts are unlike other cases where the plaintiff was deemed unqualified due to a complete lack of work-related capabilities. *See Shivakumar v. Abbott Labs.*, 2001 U.S. Dist. LEXIS 9628, at *24 (N.D. Ill. July 9, 2001) (finding that plaintiff was not a qualified individual with a disability as defined by the ADA because plaintiff herself admitted that, at the time of her discharge, she "couldn't do anything.").

If Plaintiff was unable to meet any job-related requirements, it was due solely to Defendant's failure to offer reasonable accommodations. "When a disabled employee cannot perform the essential functions of a job, the court must consider whether any reasonable accommodation by the employer would help the employee to perform those functions." *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir. 1996); 42 U.S.C. § 12112(b)(5)(A). Reasonable accommodation may include "job restructuring, part-time or *modified work schedules… appropriate adjustment or modifications of examinations…* and other similar accommodations for individuals with disabilities." (emphasis added) 42 U.S.C. § 12111(9)(B).

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS  60603
(312)332-6733

ARDC # 06187364

Therefore, Defendant is still in violation of the ADA by denying Plaintiff's request for reasonable accommodation, (i.e. a modified work schedule involving an extension and an appropriate modification of Defendant's examination policy), that would have enabled him to close any gaps in meeting the essential functions of the job. *Contra Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001) (When an employee is unable to perform the essential function of attendance, few, if any, reasonable accommodations exist.).

Despite Defendant's reliance on *Leisen v. City of Shelbyville,* 153 F.3d 805 (7th Cir. 1998), a line must be drawn between those who request an accommodation to *bypass* a testing requirement altogether, and those who request a reasonable accommodation in order to *enable* him to pass the test. While *Leisen* stressed that a defendant has no obligation to remove a qualification standard, Plaintiff is not requesting that type of elimination. Rather, Plaintiff requested an extension of time and reinstatement in order to meet that qualification.

### III.     Plaintiff Can Establish a Disparate Treatment Claim under the ADA

The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability..." 42 U.S.C. § 12112. Here, Defendant discriminated against Plaintiff by refusing to grant him an extension of time for the treatment of his disability, and refusing to grant subsequent reinstatement. (Def. Ex. 30); (Def. Ex. 25). Utilizing the prima facie showing required under the *McDonnell Douglas* framework, Plaintiff must show: "(1) he is disabled within the meaning of the ADA, (2) his work performance met Defendant's legitimate expectations, (3) he was subjected to an adverse employment action, and (4) circumstances surrounding the adverse action indicate that it is more likely than not that his disability was the reason for the adverse action. *Weigel v. Target Stores*, 122 F.3d 461, 465 (7th Cir. 1997).

Plaintiff possesses a disability within the meaning of the ADA, defined as "a physical

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

or mental impairment that substantially limits major life activities." 42 U.S.C. § 12102(2). Here, Plaintiff's disability substantially limits the performance of a major life activity—sleeping. The Seventh Circuit has established that sleeping is a major life activity. *Scheerer v. Potter*, 443 F.3d 916, 919-20 (7th Cir. 2006). Plaintiff has substantiated the severity of his condition to warrant it as a disability via medical documentation. (Def. Ex. 3). If the court were to instead consider Plaintiff's disability to be interfering with the major life activity of passing the USMLE- Step 3 exam, a court has also determined that to be a major life activity for a future doctor. *See Biank v. National Bd. of Med. Examiners*, 130 F. Supp. 2d 986, 991 (N.D. Ill. 2000) ("[T]he USMLE…is a major life activity of working as a duly licensed medical doctor.").

      Plaintiff met his employer's legitimate expectations as evidenced by Dr. Gopal's recommendation letter, (Ex. D), his promotion to Co-chief Resident, and the myriad of positive reviews. (Def. Ex. 2, pp. 92:2-4, 93:16-21, 99:9-12, 115:9-11, 126:16-127:5, 129:14-20, 168:8-11, 169:2-4). Any underperformance of Defendant's expectations was derived directly from Defendant's failure to provide Plaintiff with a reasonable accommodation. Plaintiff also suffered an adverse employment action. "At a minimum, the employee must be able to show a quantitative or qualitative change in the terms or conditions of employment." *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). Plaintiff was subjected to an adverse employment action when he was forced into resignation, and then refused an extension to continue the program, and further reinstatement—all of which drastically change Plaintiff's terms and conditions of employment. (Def. Ex. 30); (Def. Ex. 25); (Def. Ex. 4, pp. 73:25-74:3).

      Lastly, the circumstances surrounding Plaintiff's termination and declined reinstatement indicate that it is more likely than not that his disability was the reason for these adverse actions. In refusing Plaintiff's requests, Defendant relies heavily on its policy which prohibits

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

more than three attempts of Step 3. But, Dr. Nalu Reddy, a Carle resident without a disability, was permitted to continue with the Program after failing the Step 3 exam three times. This allowance was the sole justification that Defendant provided for Plaintiff's termination that later allowed Defendant to similarly reject Plaintiff's request for reinstatement. (Def. Ex. 1, 35:10-19); (Def. Ex. 4, 79:12-15). Enough evidence exists to establish that there is at least a genuine issue of material fact as to whether Defendant discriminated against Plaintiff because of his disability.

### IV. Plaintiff Has Sufficient Evidence to Establish Retaliation under the ADA

The ADA prohibits retaliation against any individual who has opposed an act made unlawful by the ADA. 42 U.S.C. § 12203(a). An employee has a viable retaliation claim under the direct method when he can show: (1) he was engaged in statutorily protected activity; (2) the employer committed an adverse act against him; and (3) a causal connection between the two. *Davis v. Con-Way Transportation Central Express, Inc.*, 368 F.3d 776, 786 (7th Cir. 2004); An employer may attempt to rebut a prima facie case by putting forth a non-discriminatory explanation for its decision. *Hunt-Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir. 1997). A plaintiff can then show that the stated reason is pretext either by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly by showing that the employer's proffered explanation was unworthy of credence. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994).

Plaintiff relies on circumstantial evidence to support his claim. "'Direct evidence' is defined the same for discrimination and retaliation claims--that is, it can be an admission of intentional discrimination or a 'mosaic' of circumstantial evidence that directly points to a discriminatory intent." *Anderson*, 13 F.3d at 1124. Here, Plaintiff satisfies all elements of his *prima facie* case. Although Defendant attempted to offer a non-retaliatory reasons for

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

Plaintiff's termination and rejected reinstatement, each explanation is "unworthy of credence." Defendant's strict adherence to its arbitrary policy is nothing more than a pretext for retaliation.

Plaintiff engaged in protected activity when he complained internally to Defendant regarding the neuropsychological testing, his disparate treatment, and failure to accommodate him around March 2012. *Hawkins v. Groot Indus.*, No. 01 C 1731, 2003 U.S. Dist. LEXIS 5051, at *39-40 (N.D. Ill. Mar. 31, 2003) (internal complaints qualify as protected activity); *Fredricksen v. UPS*, No. 06 C 2285, 2008 U.S. Dist. LEXIS 32460, at *59 (N.D. Ill. Mar. 31, 2008) (plaintiff engaged in a protected activity when he filed an internal complaint); *Melton v. Five Four Corp.*, No. 99 C 1274, 2000 U.S. Dist. LEXIS 638, No. 99 C 1274, at *11 (N.D. Ill. Jan. 25, 2000) (complaining to a manager constitutes statutorily protected activity).

Next, Plaintiff has offered facts sufficient to allow a jury to conclude that his termination and barred return constitute an adverse employment action. At a minimum, the complained of action must materially affect the employment conditions, *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 932 (7th Cir. 1996), which requires "more than a mere inconvenience or an alteration of job responsibilities.'" *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir. 2000). What constitutes an adverse employment action "has been defined quite broadly in the Seventh Circuit." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Here, Plaintiff's termination, a clear alteration of his terms of employment, and Defendant's refusal to reinstate him to rightful employment, embodies quintessential examples of adverse employment actions.

Lastly, to establish a causal link, Plaintiff need only establish "that the protected activity and the adverse action were not wholly unrelated." *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 n. 4 (7th Cir. 1989). There need not necessarily be a "rich mosaic" of evidence; rather, "a number of weak proofs can add up to a strong proof." *Mataya v. Kingson*,

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

13

371 F.3d 353, 358 (7th Cir. 2004). Circumstantial evidence demonstrating intentional discrimination can be proven by suspicious timing, ambiguous oral or written statements or evidence that similarly situated employees outside the protected class received systematically better treatment. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007).

Defendant's ambiguous comments, oral and written, as well as Defendant's attempt to cover-up their retaliatory motive by relying on facts predetermined by virtue of their denial of Plaintiff's accommodation, both lead to an inference of a causal connection, and that Defendant's explanation for Plaintiff's termination is pretext. If this showing of pretext requires weighing the credibility of witnesses or the facts in question, summary judgment is inappropriate. *United Ass'n of Black Landscapers v. Milwaukee*, 916 F.2d 1261, 1265-66 (7th Cir. 1990).

Here, Plaintiff was subjected to a number of ambiguous comments and situations that suggest a causal link between his termination and lack of reinstatement, and his internal complaints. First, Plaintiff was humiliated when HR personnel, Tammy Plutz, revealed to other residents that Plaintiff had failed his Step 3 exam—a clear breach of confidentiality, especially in light of his disability. (Def. Ex. 2, pp. 236:5-238:2). Plaintiff's disability was further downplayed and disrespected when Dr. Nelson dismissed his disability as insignificant by labeling it collectively with all "common" fatigue complaints that all residents complain of. (Def. Ex. 1, 30:10-14). Plaintiff's own advisor, Dr. Kim, responded to Plaintiff's with an accusation that "he is the problem." (Def. Ex. 2, 258:5-15). These ambiguous comments are strong circumstantial evidence of Defendant's intentional discrimination against Plaintiff due to his disability.

Plaintiff also brings circumstantial evidence that similarly situated employees outside the protected class received systematically better treatment. Despite Defendant's strong

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

foothold on their policy refusing more than three attempts at Step 3, Defendant has previously made an exception for Dr. Nalu Reddy, a non-disabled resident, who was permitted to continue with the Program after failing the USMLE Step 3 three times. (Def. Ex. 1, 35:10-19); (Def. Ex. 4, 79:12-15). Moreover, Defendant's promotion of Plaintiff to Co-Chief Resident, a position reserved for PGY-3 Residents only, while he was still not officially eligible for PGY-3 status, signifies Defendant's ability to deviate from its policy at its choosing. (Def. Ex. 4, 62:17-63:2).

Defendant knew that if it refused to provide reasonable accommodations for Plaintiff, he would more than likely fail his Step 3 exam for a third time. From there, Defendant would be able to rely on its arbitrary Step 3 policy as justification for termination and refusal for reinstatement. The same situations and ambiguous comments establishing Plaintiff's causal connection proves that Defendant's reason for Plaintiff's termination, failing the Step 3 exam three times, is nothing more than pretext. In this case, ample evidence contradicts Defendant's stated reasons for Plaintiff's termination, and goes even further to vindicate Plaintiff's actions.

### V.    Plaintiff Can Satisfy His Burden of Proof at Summary Judgment to Establish a Failure to Accommodate Claim Under the ADA

"Discrimination," as proscribed by the ADA, also encompasses a failure to provide a reasonable accommodation. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997). Here, Defendant failed to provide reasonable accommodations to Plaintiff by refusing requested accommodations altogether, and by offering woefully insufficient adjustments in an attempt to satisfy ADA obligations. To succeed, Plaintiff must show: (1) he is a qualified individual; (2) Defendant was aware of his disability; and (3) Defendant failed to reasonably accommodate the disability. As to the third element, the ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation. If a disabled employee shows that her disability was not reasonably

LAW OFFICES
GOLDMAN & EHRLICH
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

Plaintiff has already made the predicate showing that he is a "qualified individual with a disability." An individual is "disabled" under the ADA if he has an impairment that substantially limits one or more of his major life activities. *See* 42 U.S.C. § 12102(2). "Major life activities" are those that are of "central importance to . . . daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002). As a resident in the medical profession, passing each step of the USMLE is certainly of central importance to daily life. Furthermore, an impairment only rises to the level of a disability under the ADA if the impairment "substantially limits" one or more of these major life activities. See 42 U.S.C. § 12102(2). It is certainly true that Plaintiff's success in passing the USMLE Step 3 was substantially limited by his disability. (Def. Ex. 25).

Next, Defendant was well-aware of Plaintiff's disability, as demonstrated by Defendant's verbal responses and internal communications. (Def. Ex. 20); (Def. Ex. 14). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." 29 C.F.R. § 1630.9 App. (1995). No matter how vague or slight in nature, Plaintiff's notice of his disability was at least sufficient enough to put Defendant on reasonable notice of its presence. Defendant's duty to see through to this awareness is "dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate." *Sears, Roebuck & Co.*, 417 F.3d at 803. Plaintiff's struggle with his sleeping disability was far from secretive.

Plaintiff has unquestioningly fulfilled the initial duty to first inform Defendant of his disability. *Id*. At most, this requires that the employee indicate (not necessarily dictate) to the employer that he has a disability and desires an accommodation. *Jovanovic v. In-Sink-Erator*

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

*Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000); *Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1285-86 (7th Cir. 1996) (employee may not need to explicitly request an accommodation; "if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.").

Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification. *See Bultemeyer*, 100 F.3d at 1285. In other words, Defendant cannot shield itself from liability by explicitly choosing not to follow-up on an employee's request for an accommodation, or by intentionally remaining in the dark. *Sears, Roebuck & Co.*, 417 F.3d at 804. Here, Defendant cannot shield itself from liability by either choosing not to follow-up on a neurological evaluation request, or consciously choosing to remain aloof as to the severity of Plaintiff's disability and why it would necessitate an extension of time and/or reinstatement back into the Program.

The employer and employee must work together through an "interactive process" to determine the extent of the disability and what accommodations are appropriate. *Sears, Roebuck & Co.*, 417 F.3d at 804. Here, Defendant was sufficiently aware of Plaintiff's disability, insomuch as to trigger an interactive process. Plaintiff's responsibility to provide additional information within, including medical documents, arose only after Defendant seeks clarification of the nature of employee's disability and inquired as to whether proposed accommodations would meet Plaintiff's need—neither of which were executed as mandated by the ADA. *Id*.

Defendant's reasoning for rejecting Plaintiff's extension and reinstatement amounts to no more than an unresponsive "because that's how we do things." (Def. Ex. 30); (Def. Ex. 22)

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

17

(Def. Ex. 4, 73:2-6). Not only does Defendant fail to escape liability by arguing that no reasonable accommodation is possible, but Defendant also fails to participate in the give-and-take nature of the interactive process in order to fully determine what accommodation would enable the Plaintiff to keep working. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (an employer cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why); *see also Lovejoy-Wilson v. NOCO Motor Fuel Inc.*, 263 F.3d 208, 219 (2d Cir. 2001) (a rigid adherence to its policy is "the antithesis of participation in an interactive process."). A hollow or empty response consisting of a reflexive default to an arbitrary policy will not satisfy Defendant's ADA obligation.

Plaintiff has made an initial showing that the accommodation he sought was "reasonable on its face." Plaintiff requested an extension of time to pass Step 3 in addition to reinstatement. In the absence of any rule of law besides Defendant's own subjective policy, Defendant has failed to argue why such requests would be unreasonable. (Def. Ex. 30); (Def. Ex. 4, 73:2-6). Reasonableness "depends on a good faith effort to assess the employee's needs and to respond to them." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir. 1996). Defendant cannot argue that additional time or reinstatement may have led to Plaintiff nonetheless failing Step 3 again, because "reasonableness does not depend solely on effectiveness or timeliness." *Feliberty*, 98 F.3d at 280. Besides, if Defendant was willing and able to make an exception for Dr. Reddy in the past, they have offered no new reason why such a request has risen to sudden irrationality.

Lastly, Defendant failed to reasonably accommodate the disability. An employer must make "reasonable accommodations" to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). At the very least, an employer is obliged to provide an accommodation that effectively

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

accommodates the disabled employee's limitations. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 400, 152 L. Ed. 2d 589, 122 S. Ct. 1516 (2002) ("An ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations."); *Sears, Roebuck & Co.*, 417 F.3d at 802. For example, it was unreasonable and ineffective to offer Plaintiff additional time off in order to successfully complete USMLE Step 3 when it put him in immediate danger of not satisfying a different time policy that required him to fulfill all exam obligations within a strict, seven year block. (Def. Ex. 4, 59:1-6); (Def. Ex. 2, pp. 214:18-216:2).

As a matter of timeliness, Plaintiff concedes to Defendant's argument that his late 2010 and/or January 2011 request a reduced workload falls outside of the EEOC's 300-day statute of limitations. (Def. Mot., pg. 30, ¶ 2). However, Plaintiff's additional requests for accommodation include: (1) a request for an extension of time in the program to complete his residency as planned with a one month extension on September 29, 2012. (Def. Ex. 25); and (2) a request for reinstatement into the program after his forced resignation on November 1, 2012. Both requests occurred after June 2, 2012, and therefore fall within the 300-day statute of limitations.

A jury could concluded that Defendant was aware of Plaintiff's condition and his desire to be accommodated, thus triggering Defendant's obligation to engage in the interactive process. This record presents a genuine issue of material fact on whether Defendant was responsible for the breakdown in the interactive process.

## CONCLUSION

The record presents evidence of at least a genuine issue of material fact as to whether Defendant discriminated and retaliated against Plaintiff for his protected activity, as well as whether Defendant also failed to accommodate him for his disability. For the aforementioned reasons, this Court should deny Defendant's motion for summary judgment.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364

Dated: November 23, 2015								Respectfully Submitted,

      /s/ Arthur R. Ehrlich
Arthur Ehrlich of GOLDMAN & EHRLICH, *One of Complainant's Attorney*

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06187364